**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

DAVID SANCHEZ,              ) Case No. EDCV 16-2067-JPR
                           )
           Plaintiff,   )
                         ) **MEMORANDUM DECISION AND ORDER**
       v.          ) **AFFIRMING COMMISSIONER**
                         )
NANCY A. BERRYHILL, Acting   )
Commissioner of Social      )
Security,[1]                   )
                         )
         Defendant.   )
                         )

**I.   PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security disability insurance benefits ("DIB"). The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c). The matter is before the Court on the parties' Joint Stipulation, filed October 27, 2017, which the Court has taken under submission without oral argument. For the reasons stated below, the Commissioner's decision is affirmed.

---

[1] Nancy A. Berryhill is substituted in as the correct Defendant. <u>See</u> Fed. R. Civ. P. 25(d).

1

## II. BACKGROUND

Plaintiff was born in 1963. (Administrative Record ("AR") 166, 180.) He completed the 11th grade (AR 40, 287) and last worked in a warehouse (see AR 39, 293).

In August 2013, Plaintiff filed an application for DIB (see AR 267-68), alleging that he had been disabled since November 5, 2007, because of deterioration of the spine, hips, and knees; muscle spasms; high blood pressure; numbness in the hands, back, legs, and feet; and severe anxiety (AR 166-67, 180-81). After his application was denied initially (AR 197-201) and on reconsideration (AR 204-08), he requested a hearing before an Administrative Law Judge (AR 210-11). A hearing was held on February 5, 2015 (see AR 24), at which Plaintiff, who was represented by counsel, testified, as did a vocational expert.[2] (AR 36-53.) In a written decision issued March 19, 2015, the ALJ found Plaintiff not disabled. (AR 24-35.) Plaintiff requested review from the Appeals Council (AR 17), and on July 25, 2016, it denied review (AR 2-8). This action followed.

---

[2] Plaintiff had two prior applications, both of which were denied in final decisions. (See AR 146-60.) The hearing for the latter of those apparently also took place on February 5, but in 2012. (See AR 83-142 (hearing date of Feb. 5, but marked as 2015). But see AR 146 (prior ALJ noting hearing date of Mar. 8, 2012).) During the hearing that is marked on the transcript as having taken place in February 2012, the ALJ and claimant clearly discuss, in the past tense, things from April 2012 through "the late part" of that year. (E.g., AR 41.) Moreover, the hearing in the transcript that is marked as having taken place in February 2015 was presided over by ALJ Lynn Ginsberg, who issued the 2012 decision. (See AR 83-160.) Thus, it appears that the February 2015 hearing transcript was inadvertently marked as 2012, and the one from 2012 was mistakenly marked as 2015. The parties do not contend otherwise. (See, e.g., J. Stip. at 17 n.7.)

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for the Commissioner's. Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

1        A.   The Five-Step Evaluation Process

2        The ALJ follows a five-step sequential evaluation process to

3   assess whether a claimant is disabled.   20 C.F.R.

4   § 404.1520(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th

5   Cir. 1995) (as amended Apr. 9, 1996).   In the first step, the

6   Commissioner must determine whether the claimant is currently

7   engaged in substantial gainful activity; if so, the claimant is

8   not disabled and the claim must be denied.   § 404.1520(a)(4)(i).

9        If the claimant is not engaged in substantial gainful

10  activity, the second step requires the Commissioner to determine

11  whether the claimant has a "severe" impairment or combination of

12  impairments significantly limiting his ability to do basic work

13  activities; if not, the claimant is not disabled and his claim

14  must be denied.   § 404.1520(a)(4)(ii).

15       If the claimant has a "severe" impairment or combination of

16  impairments, the third step requires the Commissioner to

17  determine whether the impairment or combination of impairments

18  meets or equals an impairment in the Listing of Impairments set

19  forth at 20 C.F.R. part 404, subpart P, appendix 1; if so,

20  disability is conclusively presumed.   § 404.1520(a)(4)(iii).

21       If the claimant's impairment or combination of impairments

22  does not meet or equal an impairment in the Listing, the fourth

23  step requires the Commissioner to determine whether the claimant

24  has sufficient residual functional capacity ("RFC")[3] to perform

25  _____

26       [3] RFC is what a claimant can do despite existing exertional
    and nonexertional limitations.   § 404.1545; see Cooper v.
27  Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).   The
    Commissioner assesses the claimant's RFC between steps three and
28  four.   Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017)

4

his past work; if so, he is not disabled and the claim must be denied. § 404.1520(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 404.1520(a)(4)(v); Drouin, 966 F.2d at 1257. That determination comprises the fifth and final step in the sequential analysis. § 404.1520(a)(4)(v); Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B. The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity between November 5, 2007, the alleged disability-onset date, and December 31, 2012, his date last insured. (AR 26.) At step two, he concluded that he had the following severe impairments: "low back pain, obesity, hypertension, panic disorder with agoraphobia, anxiety, obsessive-compulsive disorder, atrial fibrillation, and umbilical hernia." (AR 27.) At step three, he found that he did not have an impairment or combination of impairments falling under a Listing. (AR 27-28.)

At step four, the ALJ found that Plaintiff had the RFC to perform medium work subject to the following limitations:

_____

(citing § 416.920(a)(4)).

lift and carry 50 pounds occasionally and 25 pounds
frequently; never climb ladders, ropes, or scaffolds; no
jobs requiring the use of moving hazardous machinery or
exposure to unprotected heights; capable of
understanding, remembering, and carrying out simple
instructions; capable of making judgments on simple work-
related decisions; capable of interacting appropriately
with supervisors and coworkers, but can have only
superficial and no direct interaction with the public;
and is able to respond to usual work situations and
changes in routine work settings.

(AR 28.) The RFC repeats the limitations assessed in a prior
ALJ's decision, from April 13, 2012. (AR 146-60.) The ALJ here
determined that "there [was] no new and material evidence
warranting a change" from those earlier findings and found that
the prior decision gave rise to a presumption of continuing
nondisability after that adjudicated period. (AR 24.) As
discussed in Section V, that was appropriate under <u>Chavez v.</u>
<u>Bowen</u>, 844 F.2d 691, 693 (9th Cir. 1988).

Based on the VE's testimony, the ALJ concluded that
Plaintiff could not perform his past relevant work. (AR 31.) At
step five, the ALJ found that given Plaintiff's age, education,
work experience, and RFC, he could perform three "representative"
jobs in the national economy. (AR 31-32.) Thus, the ALJ found
Plaintiff not disabled. (AR 32.)

**V.   DISCUSSION**

Plaintiff argues that the ALJ erred in rejecting his
subjective symptom testimony. (J. Stip. at 5-13.) The ALJ,

however, provided several acceptable reasons for doing so:
Plaintiff "appeared to exaggerate some of his symptoms" (AR 30);
"the medical evidence [did] not corroborate" the "alleged
worsening of his physical and mental impairments," which
"appear[ed] to have occurred well after the date last insured"
(AR 29-30); he failed to "follow up" on treatment for a hernia
and there was "little in the way of mental status examinations"
(id.); and his alleged "condition [did] not keep him from
performing activities of daily living" during the relevant period
(AR 30; see also AR 27). Accordingly, because the ALJ did not
err, remand is unwarranted.

As discussed by the ALJ (AR 24), the relevant period for
purposes of DIB was from April 13 to December 31, 2012: a prior
decision finding Plaintiff not disabled was issued on April 13;
it apparently was not appealed and became final (see AR 146-60);
and Plaintiff's date last insured was December 31 (see AR 29).
During that period, a presumption of continuing nondisability
applied under Chavez, 844 F.2d at 693, and could be rebutted by a
showing of "changed circumstances" indicating a "greater
disability," id.; Lester, 81 F.3d at 827 (citing Taylor v.
Heckler, 765 F.2d 872, 875 (9th Cir. 1985)). The ALJ determined
that no such showing was made (AR 24), and Plaintiff has not
challenged that finding (see generally J. Stip).

A.  Applicable Law

An ALJ's assessment of the credibility of a claimant's
allegations concerning the severity of his symptoms is entitled
to "great weight." See Weetman v. Sullivan, 877 F.2d 20, 22 (9th
Cir. 1989) (as amended); Nyman v. Heckler, 779 F.2d 528, 531 (9th

Cir. 1985) (as amended Feb. 24, 1986). "[T]he ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).'" Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).

In evaluating a claimant's subjective symptom testimony, the ALJ engages in a two-step analysis. See Lingenfelter, 504 F.3d at 1035-36; see also SSR 96-7p, 1996 WL 374186 (July 2, 1996).[4] "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged." Lingenfelter, 504 F.3d at 1036. If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).

---

[4] Social Security Ruling 16-3p, 2016 WL 1119029, effective March 16, 2016, rescinded SSR 96-7p, which provided the framework for assessing the credibility of a claimant's statements. SSR 16-3p was not in effect at the time of the ALJ's decision in this case, however, and therefore does not apply. Still, the Ninth Circuit has clarified that SSR 16-3p "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." Trevizo v. Berrhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (as amended) (alterations in original) (quoting SSR 16-3p).

If the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only if he makes specific findings that support the conclusion. See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014). If evidence of malingering exists, however, the ALJ may reject the claimant's symptom testimony by stating why the testimony is unpersuasive. Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006); see also Bagoyan Sulakhyan v. Astrue, 456 F. App'x 679, 682 (9th Cir. 2011) ("When there is affirmative evidence of malingering, which is present in this case, the ALJ is relieved of the burden of providing specific, clear, and convincing reasons to discount claimant's testimony."); Schow v. Astrue, 272 F. App'x 647, 651 (9th Cir. 2008) ("[T]he weight of our cases hold that the mere existence of 'affirmative evidence suggesting' malingering vitiates the clear and convincing standard of review.")

In assessing credibility, the ALJ may consider, among other factors, (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties. Rounds v.

9

Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as amended); Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002). If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing." Thomas, 278 F.3d at 959.

B. Relevant Background

In April 2012, Plaintiff was found not disabled by a prior ALJ. (AR 146-60.) She assessed him with severe impairments of "low back pain; obesity; hypertension; panic disorder with agoraphobia; anxiety; obsessive-compulsive disorder; atrial fibrillation; and umbilical hernia" (AR 149) but found his subjective symptom testimony only "partially credible." (AR 152.) Plaintiff, she reasoned, "portray[ed] limitations that [were] not actually present," pointing to a consulting orthopedic physician and a psychiatrist who noted that he was "exaggerat[ing] some symptoms." (AR 152, 156.) The ALJ noted that Plaintiff was at one point deemed ineligible for "narcotic pain medication" because he was "accused of altering the prescription." (AR 154.)[5] And despite complaints of pain in his

_____

[5] At his 2012 hearing, the prior ALJ asked Plaintiff about "evidence [in] the record[] showing that [his] doctor reported [him] to the police for changing prescriptions." (AR 90-91 (referencing Mar. 23, 2011 medical note from doctor who had "called to report [Plaintiff's] illegal activity to Riverside County dispatcher").) Plaintiff stated that he had "no idea" what that was about and that his doctors "wouldn't give [him] a reason" why he "couldn't have [Vicodin] no more." (AR 91-92.) He indicated that he was taking Ibuprofen instead. (AR 114.) Plaintiff's counsel clarified that his Vicodin prescription had been altered in October 2010 from 30 pills to 90 and that he was never contacted by the hospital or police department regarding that change. (AR 117.) Despite having testified that he was not given any explanation for why his Vicodin prescription was

lower back, hips, and knees, his condition was "controlled" with medication, and a consulting orthopedic surgeon found him to have "no functional limitations." (See AR 154-56.) The ALJ further noted that Plaintiff was assessed with an umbilical hernia and had been referred to a general surgeon. (AR 155.) She also indicated that he was diagnosed with atrial fibrillation and reported shortness of breath but "no chest pain or palp[it]ations."[6] (Id.)

Plaintiff's first doctor's visit after the end of the adjudicated period, April 13, 2012, occurred in June 2012, when he visited a Riverside county health center "to establish a [doctor]," complaining of pain in his back, hip, and right knee. (AR 434, 436.) He denied any injury and stated that he had had pain "since age 17" and that it was "constant." (AR 434.) He also reported decreased pain with medication. (Id.) He was noted as being obese, was assessed with "a. fib," anxiety, bipolar disorder, pain, and obesity, among other conditions, and was prescribed Vicodin.[7] (AR 434, 436.)

---

stopped, Plaintiff later testified that he "was told" that his doctors thought he was "selling" because of "the way [he] look[ed]." (AR 118-19.) Before the hearing closed, he stated that he was "messed up . . . with the police thing" and that he had "[n]ever been in juvenile hall, cuffs on me, and then they treat me like that." (AR 141.)

[6] Atrial fibrillation is a type of arrhythmia that involves irregular twitchings of the muscular wall and a problem with the speed or rhythm of the heartbeat. See Stedman's Medical Dictionary 668 (27th ed. 2000); Atrial Fibrillation, MedlinePlus, https://medlineplus.gov/atrialfibrillation.html (last updated Feb. 12, 2018).

[7] Vicodin is a narcotic hydrocodone combination product containing acetaminophen and is used to relieve moderate to

Plaintiff returned in July 2012 to review the results of "labs" done the previous month. (AR 432; see also AR 460-61.) He was again assessed with "a. fib," anxiety, depression, obesity, and chronic pain, among other conditions. (AR 432.) Later that month, he requested medication refills, including Vicodin. (AR 430.) He complained that he was "not getting Vicodin anymore . . . and ha[d] to pay for it now." (Id.) He suggested a method for getting it paid for once again. (Id.) He was noted as being obese but "s[at] comfortably." (Id.) He was assessed with lower-back pain, anxiety, and atrial fibrillation. (Id.) X-rays of his back were ordered, and he was referred for an electrocardiogram. (Id.; see also AR 451.)

By August 2012, the x-rays and EKG hadn't been completed. (AR 428.) At that time, he complained of back pain, for which he was requesting "Vicodin again," and "bad heartburn" and was assessed with "chronic [low-back pain]" and "GERD."[8] (Id.) By September 2012, the x-rays still hadn't been completed because Plaintiff didn't "have [money] to drive to" the medical center. (AR 426.) He stated that he had "no money," "[couldn't] get work at Home Depot," and "want[ed] disab[ility] for all his prob[lems]." (Id.)

---

severe pain. See Hydrocodone Combination Products, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601006.html (last updated Jan. 25, 2018). Plaintiff's new doctor may have been unaware that he had previously been denied any more Vicodin because he was suspected of abusing or reselling it.

[8] Gastroesophageal reflux disease occurs when a muscle at the end of the esophagus does not close properly, allowing stomach contents to leak back into the esophagus and irritate it. See GERD, MedlinePlus, https://medlineplus.gov/gerd.html (last updated Oct. 17, 2017).

12

X-rays of his lumbar spine were completed in October 2012 (AR 448-50), and x-rays of his knees, feet, and hips were completed in November (AR 444-47). During that time, Plaintiff began meeting with family-medicine doctor Edward Bacho, who reviewed his x-rays. (AR 448, 450, 452; see also AR 500.) In October, Plaintiff complained to Dr. Bacho of ongoing low-back pain, knee pain, and foot pain but stated that the pain was "controlled on Norco"[9] and that his goal was to work as a "forklift/warehouse worker [with] controlled pain." (AR 423.) In November, Plaintiff noted "no change" since his October visit (AR 421), and Dr. Bacho indicated that his x-rays showed no problems in his feet, hips, or spine except for spurring at "L2-L5" (id.; see also AR 445-50) and "mild degenerative change" in his right knee, with no problems in his left (AR 421; see also AR 444). Dr. Bacho recommended that Plaintiff receive a "steroid injection" for his right knee. (AR 421.) That injection was administered in December 2012. (AR 419.)

Plaintiff indicated in January 2013 that his knee pain "significantly improved" following the injection and that his "pain [was] controlled on Norco." (AR 417.) He was next seen in April 2013 and did not complain of any pain. (AR 410.) In June, he reported "numbness in [his] back legs" and "feeling weak." (AR 409.) The next month, Plaintiff reported that he had had "good results" from the December 2012 knee injection but that his

---

[9] Norco is a narcotic hydrocodone combination product containing acetaminophen and is used to relieve moderate to severe pain. See Hydrocodone Combination Products, MedlinePlus, https://medlineplus.gov/druginfo/meds/a601006.html (last updated Jan. 25, 2018).

pain was "recently slowly returning." (AR 416.) Dr. Bacho administered another steroid injection to his right knee in August 2013. (AR 414-15.) An echocardiogram was also conducted at that time, which showed "[a]trial fibrillation" and "moderate concentric left ventricular hypertrophy" but overall "normal" "left ventricular systolic function" and otherwise "normal" results. (AR 405-06; see also AR 442 (Apr. 2013 medical image of Plaintiff's chest showing "no evidence of acute cardiac or respiratory disease").) In September, Plaintiff met with Dr. Bacho to review his "Echo results" and had "no other complaints." (AR 412.) In November, Plaintiff reported "8/10 pain" because he was out of medication. (AR 407.)

Plaintiff completed an Adult Function Report in September 2013, nine months after the relevant period had ended. (AR 305-13.) He answered the questions in the present tense and did not indicate how long his symptoms had lasted. (Id.) He stated that he was unable to work because his atrial fibrillation caused him to be dizzy, light-headed, and short of breath and his back and hips caused severe pain. (AR 305.) He reported that he took care of his dog by walking and feeding him (AR 306); had "no problem with personal care" despite "sometimes" getting short of breath or experiencing dizziness, severe pain, or "numbness in [his] legs" (id.); prepared his own meals daily, a habit that had not changed since his alleged conditions began (AR 307); washed his own dishes "each day" (id.); walked, rode in cars, and went out alone (AR 308); shopped in stores for food (id.); and went to the "doctors" and "store" on "a regular basis" (AR 309). He stated that he "could use a wheel chair or a cane [or] walker"

14

but that he "d[idn't] have any money" for one. (AR 311.)

He also reported having problems getting along with family, friends, neighbors, and others because of his "depression [and] anxiety." (AR 310.) He stated that he "sometimes" didn't go out because of his "anxiety." (AR 308.) Plaintiff further indicated that he lived with family (AR 305; see also AR 98-101 (testifying before prior ALJ that he and his fiancé lived with seven friends)) and that his fiancé and grandson helped him care for his dog (AR 306). He stated that he shopped in stores regularly (AR 308, 309), regularly saw doctors (AR 309), and talked with his grandchildren every day (id.; see also AR 105-06 (testifying in Feb. 2012 that he saw his grandchildren "once, twice a week" to help babysit)).

At his February 2015 hearing, Plaintiff was asked specifically about his experiences between April and December 2012, his date last insured. (AR 41-49.) He testified that in the late part of 2012, he experienced problems with his lower back, feet, ankles, and knee. (AR 42.) He stated that his right knee caused pain and "off and on" swelling. (AR 43-44.) He had received two steroid shots as treatment, and he testified that the "first one" brought "a little bit" of relief, while the "second one, none at all."[10] (AR 44.) He experienced "numbness, aching, [and pain]" in his right ankle and numbness in his left

---

[10] As noted, Plaintiff in fact told Dr. Bacho that his pain "significantly improved" with the first shot but that after six months it was "slowly returning." (AR 416-17.) A month after the second injection, he had "no complaints" for the doctor (AR 412), which presumably indicated that the second shot had at least temporarily relieved his pain.

thigh. (Id.) He did not need a cane in 2012 but started using one "six months" before the hearing, in late 2014. (AR 43.)

He also testified to experiencing problems breathing "every day" in late 2012 because of "AFib." (AR 45.) He had to "lay down and rest to relieve the symptoms," which included shortness of breath, for "[f]ive, ten minutes." (AR 46.) He also had problems with a hernia. (AR 48.)

Plaintiff further testified that he had anxiety and depression in late 2012. (AR 47.) When he was around "crowds of people," he stated, he would get "light headed" and have to go to the car "to get some fresh air" and "just not be around people." (Id.) Plaintiff stated that medication "help[ed]" and that he was not "presently" getting mental-health therapy because he had moved. (Id.) When asked if his "doctors ever told [him] that [he] needed that sort of therapy," he responded, "Not lately." (Id.)

C. <u>Analysis</u>

Plaintiff argues that the ALJ provided "woefully insufficient reasons to reject [his] testimony."[11] (J. Stip. at

_____

[11] Plaintiff initially argues that the ALJ discounted his testimony using "oft rejected boilerplate language." (J. Stip. at 7-8.) Boilerplate can be problematic, such as when an ALJ finds a claimant's statements not credible "to the extent they are inconsistent with the [RFC]." See, e.g., <u>Laborin v. Berryhill</u>, 867 F.3d 1151, 1154 (9th Cir. 2017); <u>Treichler</u>, 775 F.3d at 1102-03. But the ALJ's finding that Plaintiff's statements were "not entirely credible for the reasons explained in this decision" hardly fits that mold. (AR 29.) Even assuming the ALJ used some boilerplate, he specifically identified the testimony he found not credible and provided appropriate reasons supporting his finding; thus, any error was harmless. See, e.g., <u>Laborin</u>, 867 F.3d at 1154 ("[B]oilerplate language is not, by itself, reversible error and can be harmless."); <u>Treichler</u>, 775

16

7.)  He focuses in particular on the ALJ's rationale that his
testimony "lack[ed] support in the objective medical evidence,"
which he argues was a "legally insufficient" reason (id. at 8
(citing AR 29-30)), and also briefly contends that the ALJ's
highlighting of his "daily activities" was in error because he
"fail[ed] to adequately consider" how he performed his "sporadic
activities of daily living" (id. at 10-11).  But the ALJ did not
err in either regard and provided additional acceptable reasons
not challenged by Plaintiff.

      1.  <u>Malingering</u>

    As discussed, Plaintiff was found not disabled in a final
ALJ decision in April 2012, and a presumption of nondisability
under <u>Chavez</u> applied during the relevant period.  (<u>See</u> AR 24,
146-60.)  The ALJ found that the presumption was not rebutted by
a showing of "changed circumstances" (AR 24), and Plaintiff has
not challenged that determination (<u>see generally</u> J. Stip.).
Incorporating the prior ALJ's findings, the ALJ identified
evidence that Plaintiff "appeared to exaggerate some of his
symptoms."  (AR 30; <u>see</u> AR 152 (prior ALJ discussing consulting
orthopedic doctor's note that Plaintiff "exaggerate[d] some
symptoms"), 154 (prior ALJ discussing how Plaintiff "was no
longer eligible for narcotic pain medication refills because he
was accused of altering the prescription"), 156 (prior ALJ
discussing psychiatrist's note that Plaintiff "exaggerate[d] some
of his symptoms"); <u>see also</u> AR 362 (mental-health-treatment

F.3d at 1103 ("After making this boilerplate statement, the ALJs
typically identify what parts of the claimant's testimony were
not credible and why.").

record stating that Plaintiff "appear[ed] to exaggerate some symptoms")). Evidence of malingering relieves an ALJ of providing clear and convincing reasons for discounting pain testimony and is alone a sufficient basis to find a claimant not credible. See Baqoyan Sulakhyan, 456 F. App'x at 682; Schow, 272 F. App'x at 651; see also Rounds, 807 F.3d at 1006 (ALJ may rely on plaintiff's reputation for lying, prior inconsistent statements, and other testimony that appears less than candid). Thus, the ALJ properly rejected Plaintiff's testimony for that reason alone. See Baghoomian v. Astrue, 319 F. App'x 563, 565 (9th Cir. 2009) (evidence of malingering, which "indicated that [plaintiff] was exaggerating his symptoms," "relieved the ALJ from the burden of providing specific, clear, and convincing reasons to discount [his] testimony"); Swinscoe v. Astrue, No. 1:10-cv-01614-AWI-BAM, 2012 WL 2317550, at *13 (E.D. Cal. June 18, 2012) ("ALJ noted evidence that Plaintiff was exaggerating her symptoms," and "[t]his evidence of malingering arguably relieved the ALJ from the burden of providing specific, clear, and convincing reasons to discount [her] testimony").

Even assuming the clear-and-convincing standard applied, see Ghanim v. Colvin, 763 F.3d 1154, 1163 n.9 (9th Cir. 2014) (noting but not resolving ambiguity in case law regarding whether clear-and-convincing standard does not apply only when ALJ makes "actual finding of malingering" or also when record merely contains "evidence of malingering"), the ALJ articulated several additional reasons for rejecting Plaintiff's testimony, each of which was proper.

## 2. Objective medical evidence

The ALJ found that Plaintiff's allegations that his impairments had worsened during the relevant eight-month period were not corroborated by the objective medical evidence because any worsening "appear[ed] to have occurred well after the date last insured." (AR 29-30.) Contradiction with evidence in the medical record is a "sufficient basis" for rejecting a claimant's subjective symptom testimony. Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008); see Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999) (upholding "conflict between [plaintiff's] testimony of subjective complaints and the objective medical evidence in the record" as "specific and substantial" reason undermining credibility). Although a lack of medical evidence "cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (citing § 404.1529(c)(2)).[12] Not only did the ALJ properly consider the medical evidence, but it was not his sole basis for discrediting Plaintiff's testimony.

Plaintiff stated that he was unable to work between April and December 2012 because of "severe pain" in his back, hips, right knee, and ankles (AR 42, 305) and atrial fibrillation,

---

[12] Though Plaintiff challenges the ALJ's reliance on objective medical evidence to discount his testimony, he does so primarily as a matter of law and provides no argument demonstrating that the medical record in this case in fact supported a finding of changed circumstances or worsened symptoms. (See generally J. Stip.)

which caused shortness of breath (AR 45, 305). The ALJ acknowledged similar complaints alleged during the prior period (see AR 29 (noting that Plaintiff previously complained of "low back pain," "pain in the hips and knees," and "atrial fibrillation")), at the end of which Plaintiff was found not disabled, and discussed medical records demonstrating no worsening of those symptoms during the relevant eight-month period (id.). His analysis was supported by substantial evidence.

Plaintiff's medical records from the relevant period mostly involved complaints of pain in his back, hips, knee, and ankles. (See, e.g., AR 434, 436, 430, 432.) He was prescribed and took narcotic medication for that pain (AR 421, 423, 428, 430, 432, 434), which he repeatedly described as "controll[ing]" or "decreas[ing]" it (AR 434 (June 2012), 423 (Oct. 2012), 421 (Nov. 2012: no change since previous month); see also AR 417 (Jan. 2013); 410 (Apr. 2013: no pain alleged), 412 (Sept. 2013: no complaints), 528 (Jan. 2014), 516 (Aug. 2014), 508 (Oct. 2014), 504 (Nov. 2014)). In December 2012, he received a steroid injection in his right knee (AR 419), which he reported as "significantly improv[ing]" his pain (AR 417; see also AR 416). Those treatment records failed to demonstrate that his symptoms, which had been previously considered and deemed nondisabling, worsened in any way. (See AR 154-56 (prior ALJ noting findings that Plaintiff's back and hip pain were "controlled" with medication and that he had "no functional limitations" despite complaints of pain in his low back, hips, and "right knee"); see also Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006

(9th Cir. 2006) ("Impairments that can be controlled effectively
with medication are not disabling[.]"); Rodriquez v. Berryhill,
__ F. App'x __, No. 16-15252, 2017 WL 4118371, at *2 (9th Cir.
Sept. 14, 2017) (upholding fact that "condition and pain were
controlled with medication" as "specific, clear, and convincing"
reason to reject plaintiff's symptom testimony).

After the relevant period, Plaintiff required another knee
injection (AR 414-15 (Aug. 2013)) and continued to report knee,
back, and ankle pain (see, e.g., AR 502 (Dec. 2014), 504 (Nov.
2014), 508-11 (Oct. 2014), 512-15 (Sept. 2014), 518 (July 2014),
520 (June 2014), 532 (Jan. 2014)).  But medical-imaging reports
from during and after the relevant period consistently indicated
that his impairments were mild or unsubstantiated, as mentioned
by the ALJ.  (See AR 29 (ALJ describing x-rays from 2012 with
"mild" or "unremarkable" findings); see also AR 444-50 (2012 x-
rays showing "normal" left knee, "mild degenerative joint
disease" in right knee, "no acute pathology" in right foot,
"normal" and "unremarkable" left foot, "unremarkable" hips, and
"[m]ild" spurring in spine).)[13]

_____

[13] Even more than a year after the relevant time period,
diagnostic imaging showed only "mild degenerative changes without
significant spinal stenosis or neural foraminal narrowing" in
Plaintiff's back (AR 539) and "mild soft tissue swelling with no
acute fracture" in his left ankle, an "unremarkable" left knee,
and "normal" hips (AR 474-76).

The ALJ also relied on the fact that Plaintiff began using a
cane only six months before the February 2015 hearing, which was
"well after the date last insured."  (AR 30.)  But Plaintiff
testified at the hearing that he wore a "brace" on his right knee
during the relevant period (AR 43; cf. AR 95 (testifying before
prior ALJ on Feb. 5, 2012, that he didn't wear brace at that
time)) and stated in his function report that he didn't use a

Moreover, contrary to Plaintiff's assertions of debilitating atrial fibrillation, that condition apparently required little treatment during the relevant period, as Plaintiff received only an EKG referral, in July 2012. (See AR 430.) No medical imaging was completed at that time, but as identified by the ALJ, an echocardiogram conducted in August 2013 indicated that Plaintiff's atrial fibrillation remained stable, if not improved (compare AR 405-06 (Aug. 2013 echo report indicating "moderate concentric left ventricular hypertrophy" but "[o]verall left ventricular systolic function is normal with an [ejection fraction] between 65-70%"), with AR 371-72 (Oct. 2011 echo report indicating "[o]verall left ventricular systolic function . . . moderately impaired with an [ejection fraction] between 35-40%")).[14] Moreover, as pointed out by the ALJ, a chest x-ray

---

cane, wheelchair, or walker because he "d[idn't] have any money" for it (AR 311). See Smolen, 80 F.3d at 1284 (recognizing inability to "afford treatment" as "good reason" for lack of treatment and invalidating such lack of treatment as "clear and convincing reason for discrediting . . . symptom testimony"). As discussed above, however, despite Plaintiff's possible use of a brace during the relevant period, the ALJ properly discounted his testimony because the severity of his right-knee pain was not supported by the medical evidence, which showed that his condition was mild and that the pain was controlled with treatment. Thus, even if the ALJ erred, he provided other clear and convincing reasons for his adverse credibility assessment, and any error was harmless. See Larkins v. Colvin, 674 F. App'x 632, 633 (9th Cir. 2017) (citing Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004)).

[14] Left ventricular ejection fractions measure how much blood is pumped from the left ventricle of the heart. See Ejection Fraction, Cleveland Clinic, https:// my.clevelandclinic.org/health/diseases/17069-heart-failure-understanding-heart-failure/ejection-fraction (last updated Oct. 2016). An ejection fraction of "55% to 70%" indicates normal pumping ability and heart function; an ejection fraction of "35%

from April 2013 "showed no evidence of acute cardiac or respiratory disease." (AR 29; see AR 442.) Accordingly, the ALJ's rejection of Plaintiff's symptom testimony because it lacked medical evidentiary support was proper and based on substantial evidence.

### 3. Failure to seek treatment

An "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment" is a clear and convincing reason for discounting the credibility of a claimant's subjective symptom statements. Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir. 1991) (en banc); accord Molina, 674 F.3d at 1113. At his hearing, Plaintiff complained of a "stomach" hernia during the relevant period. (AR 48-49.) As the ALJ discussed, repeating the unrebutted findings of the prior ALJ, Plaintiff was "diagnosed with an umbilical hernia and was referred for surgical consultation," but he apparently did not "follow up." (AR 29; see also AR 155.) Indeed, Plaintiff's medical records indicate that on September 30, 2011, he complained of an umbilical hernia but refused a physical exam. (AR 375.) The record contains no further treatment for his alleged hernia, and Plaintiff offers no explanation for his evident lack of follow-up. The ALJ therefore properly relied on Plaintiff's failure to seek treatment in discounting his credibility. See Bunnell, 947 F.2d at 346-47; see also Hite v. Colvin, No. EDCV 14-1925 AGR, 2015 WL 4873559, at *7 (C.D. Cal. Aug. 12, 2015) (upholding ALJ's finding that plaintiff's failure

to 39%" indicates moderately below normal pumping ability and mild heart failure. Id.

to seek hernia treatment for over 16 months supported adverse credibility assessment).

Plaintiff stated that he was also unable to work because of severe anxiety. (AR 47.) The ALJ found that the "available medical evidence d[id] not substantiate [his] alleged severe anxiety" and that "there [was] little in the way of mental status examinations." (AR 30.) Indeed, Plaintiff's only available mental-health records are from before the relevant period. (See, e.g., AR 337 (Mar. 2012), 361-62 (Jan. 2012), 360 (Dec. 2011), 346 (Nov. 2011), 355 (Oct. 2011).) At his last appointment, Plaintiff was noted as being "very upset" regarding a recent "hearing for disability" in which "the judge noted an incident where [he] reportedly altered a prescription for Vicodin." (See AR 337, 363; see also AR 90-92, 117-20, 154.) He was given "homework" to complete and return at his next appointment (AR 338), but no further appointment notes are in the record. Plaintiff testified at his February 2015 hearing that he stopped receiving mental-health therapy because he moved "from Menifee to M[ore]no Valley" and "lately" no doctor "told [him] that [he] needed that sort of therapy." (AR 47.)

Though Plaintiff attempted to explain his failure to seek mental-health treatment by attributing it to his move to Moreno Valley, see Trevino v. Colvin, No. CV 12-7740 JC, 2013 WL 1191803, at *4 (C.D. Cal. Mar. 22, 2013) (plaintiff's failure to obtain mental-health treatment was "not caused by lack of effort" but instead in part by her "mov[ing away] to Santa Barbara" and "inability to locate affordable treatment"), the record indicates that the mental-health treatment he did receive was in fact in

24

Moreno Valley (see AR 337, 346, 355, 360-63), where he also
received at least some treatment for his physical impairments
(see, e.g., AR 444-50). Accordingly, without additional
explanation, the record supports the ALJ's credibility
determination, as Plaintiff was evidently more than capable of
obtaining both physical- and mental-health treatment in the
Moreno Valley area but simply did not do so during the relevant
period. See Burkstrand v. Astrue, 346 F. App'x 177, 179 (9th
Cir. 2009) (upholding as clear and convincing reason for
discrediting mental-health testimony that plaintiff "did not seek
treatment for depression during the relevant period"); Judge v.
Astrue, No. CV 09-4743-PJW, 2010 WL 3245813, at *4 (C.D. Cal.
Aug. 16, 2010) ("[The claimant's] failure to get treatment after
1997 seems more a function of the fact that she did not need it,
as opposed to her inability to comprehend that she needed
it.").[15]

    Thus, substantial evidence supports the ALJ's finding that
the severity of Plaintiff's allegations was undermined by his

---

    [15] It is sometimes "questionable practice to chastise one
with a mental impairment for the exercise of poor judgment in
seeking rehabilitation." Nguyen v. Chater, 100 F.3d 1462, 1465
(9th Cir. 1996) (citation omitted); see also Rosas v. Colvin, No.
CV 13-2756-SP, 2014 WL 3736531, at *11 (C.D. Cal. July 28, 2014)
(finding that failure to attend therapy sessions was "not
necessarily a clear and convincing reason to discount [a
claimant's] testimony"). Nguyen, however, is distinguishable.
It dealt with an ALJ who discredited a psychologist's diagnosis
of depression based on lack of a treatment record, whereas here
the ALJ relied on Plaintiff's unexplained lack of mental-health
treatment during the relevant period, despite regular treatment
in the six months prior, to discredit the severity of his alleged
symptoms. Moreover, Plaintiff's explanation for why he did not
seek mental-health treatment during that time appears to have
been demonstrably false.

failure to seek treatment.

### 4. Daily activities

An ALJ may also properly discount the credibility of a plaintiff's subjective symptom statements when they are inconsistent with his daily activities. See Molina, 674 F.3d at 1112. "Even where those [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." Id. at 1113. The ALJ here found that Plaintiff's function report, in which he alleged that his activities of daily living were "mostly [limited] due to his physical impairments," was completed "almost ten months after the date last insured" and further found that his "psychiatric condition d[id] not keep him from performing activities of daily living." (AR 30.) He specifically noted that despite his alleged limitations, Plaintiff was "capable of performing personal care, preparing simple meals, cleaning up after himself, going out alone sometimes, driving sometimes, and shopping in stores." (AR 27.) He also "socialize[d] with his grandchildren, attend[ed] medical appointments, [went] to the store, and g[ot] along with authority figures." (Id.)

Indeed, "[a]ssuming [his] activities of daily living during the relevant period were the same as described in [his function report]," see Stevens v. Colvin, No. CV 15-1259-SP, 2016 WL 3390753, at *5 (C.D. Cal. June 14, 2016), they were inconsistent with the alleged severity of his symptoms. Plaintiff, for example, alleged having severe pain in his back, hips, and right knee and experiencing shortness of breath related to atrial

26

fibrillation. (AR 42, 305.) But he reported that he walked and fed his dog, had no problem with personal care despite his symptoms, prepared his own meals daily, washed dishes daily, walked, drove, went out alone, shopped in stores, and went to the doctor. (AR 306-09.) Similar activities were reported to the prior ALJ, who noted that his described activities of daily living were "not limited to the extent one would expect[] given the complaints of disabling symptoms and limitations." (AR 152 (noting that "he could manage his own finances, drive, do light household chores, take care of his grandchild, walk his dog, and perform personal care independently"). Thus, substantial evidence supported the ALJ's adverse credibility determination. See Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (upholding ALJ's adverse credibility determination in part because ALJ found that plaintiff "le[d] an active lifestyle, including cleaning, cooking, walking her dogs, and driving to appointments"); Sharp v. Colvin, No. 1:13-cv-02028-BAM, 2015 WL 1274727, at *5 (E.D. Cal. Mar. 19, 2015) (finding that ALJ properly discounted plaintiff's testimony as inconsistent with daily activities when plaintiff cleaned his room, swept carpet, washed dishes, did laundry, cooked occasionally, went grocery shopping with his mother, cared for his dog, and walked around block).

Moreover, to the extent Plaintiff alleged an inability to be around others, including family and friends, because of his severe anxiety and depression, he demonstrated otherwise. As the ALJ noted (AR 27), he was capable of living with family, spoke with his grandchildren every day, and regularly saw doctors and

shopped in stores (AR 305-09).  To the extent he also allegedly
could not "go out" because of his anxiety, he reported taking his
dog out for walks, walking, driving, going out alone, shopping in
stores, and seeing doctors.  (AR 305-10.)  Further still, his
reported activities just before the relevant period were more of
the same: he lived with friends and regularly saw his
grandchildren to help babysit.  (See, e.g., AR 98-101, 105-06.)
Accordingly, substantial evidence in the record supports the
ALJ's conclusion that Plaintiff's activities were neither limited
by nor consistent with his allegedly debilitating psychiatric
condition.  See Womeldorf v. Berryhill, 685 F. App'x 620, 621
(9th Cir. 2017) (upholding ALJ's discounting of plaintiff's
credibility in part because his activities of daily living "were
not entirely consistent with his claimed inability to engage in
social interactions").

Finally, Plaintiff's contention that the ALJ "fail[ed] to
adequately consider" how he performed his daily activities is
unconvincing.  As discussed, "[e]ven where [a claimant's daily]
activities suggest some difficulty functioning, they may be
grounds for discrediting the claimant's testimony to the extent
that they contradict claims of a totally debilitating
impairment."  Molina, 674 F.3d at 1113.  Indeed, Plaintiff's
activities demonstrated that both his physical and mental
impairments were not totally debilitating, as he was able to
function and interact successfully with people despite any
alleged limitation.  Thus, the inconsistency between Plaintiff's
allegations and reported daily activities was a clear and
convincing reason to reject his testimony.  See Valentine v.

Comm'r Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009)
(evidence that plaintiff's daily activities "contradicted [his]
contentions about how debilitating his fatigue was" constituted
"clear and convincing reason to reject [his] subjective
testimony" even though that evidence "did not suggest [plaintiff]
could return to his old job").

**VI.   CONCLUSION**

    Consistent with the foregoing and under sentence four of 42
U.S.C. § 405(g),[16] IT IS ORDERED that judgment be entered
AFFIRMING the Commissioner's decision, DENYING Plaintiff's
request for remand, and DISMISSING this action with prejudice.


DATED: February 15, 2018         _____
                        JEAN ROSENBLUTH
                        U.S. Magistrate Judge

---

[16] That sentence provides: "The [district] court shall have
power to enter, upon the pleadings and transcript of the record,
a judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the
cause for a rehearing."